IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VIPSHOP INTERNATIONAL HOLDINGS, LIMITED,<br><br>                *Plaintiff*,<br>v.<br><br>TRANSPACIFIC TRADE CENTER LLC and KETTY PON (also known as KITTY PON).<br><br>                *Defendants*. | No. 20 C 2557<br><br>Judge Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

Transpacific Trade Centers LLC ("TTCL") entered into two contracts with VIPShop International Holdings, Limited ("VIPShop") to provide masks and protective gear in the early months of the COVID-19 pandemic. VIPShop paid TTCL the full amount, approximately $2.5 million, but TTCL failed to supply any of the products and only reimbursed VIPShop for a fraction of the total price paid. VIPShop sued TTCL and Ketty Pon—also known as Kitty Pon (collectively, "the Defendants")—for breach of contract. VIPShop also sued Pon to pierce the corporate veil and obtain redress from her personally, alleging that she and TTCL are essentially the same. VIPShop moved for summary judgment. For the following reasons, the Motion is granted.

**BACKGROUND**

VIPShop is a Hong Kong company, which acts on behalf of the government of Wenxhou China to negotiate deals for the procurement of protective gear. (Dkt. 1 ¶ 9). TTCL is an Illinois company that focuses on importing and exporting international products, including personal protective equipment. (*Id.* ¶ 10). The company was incorporated in 2016, with its primary place of business in Illinois. (Dkt. 64 at 2). Pon is the only member and manager of TTCL. (Dkt. 65 ¶¶ 10–

1

11). TTCL has no other employees, electing instead to use independent contractors. (*Id.* ¶¶ 12). Pon exclusively controls the company's sole bank account, and the corporate address on the account is also her home address. (*Id.* ¶¶ 13–14).

On February 12, 2020, early in the COVID-19 pandemic, VIPShop and TTCL entered into two contracts: the first required TTCL to supply 150,000 masks and 100,000 protective clothing units to VIPShop; and the second required TTCL to supply an additional 80,000 masks and an additional 20,000 protective clothing units. (Dkt. 57 ¶¶ 1–2). Both contracts contained an arbitration provision. (Dkt. 64 at 3). VIPShop paid TTCL about $2.5 million in total, but the masks and clothing were never delivered. (*Id.* ¶¶ 5-8). TTCL attributed the failure to various supply-chain issues. (Dkt. 66 ¶¶ 15–19). The company refunded VIPShop $531,400, about one-fifth of the money owed, but failed to pay the remainder. (Dkt. 57 ¶ 9).

VIPShop sued TTCL and Pon for breach of contract. *See* 28 U.S.C. § 1332. The complaint was filed on April 24, 2020. (Dkt. 1). The Defendants filed their answer two months later. (Dkt. 15). The attorneys entered appearances. (Dkt. 7, 8, 48). The parties participated in settlement conferences and engaged in discovery. (Dkt. 33, 37, 43, 44, 45, 46, 51, 53, 57). And almost two years later, VIPShop moved for summary judgment. (Dkt. 55).

## **LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of*

*Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

## DISCUSSION

### I. Contract Dispute

The facts are essentially not disputed. Both parties agree that they had a contract to supply the protective equipment and that TTCL failed to deliver as the contract required. Both parties agree on the amount of the contract and the amount that TTCL paid to reimburse VIPShop for its breach. Yet, after litigating this breach of contract case in this Court for two years, the defendants now assert that this dispute should go to arbitration because federal law requires a lawsuit be stayed when the parties agreed to arbitration as part of the contract. (Dkt. 64). VIPShop maintains that the defendants waited too long to invoke their right to arbitration, and moreover, they breached the terms of the contract, so summary judgment should be awarded in its favor. (Dkt. 56). The Court takes each argument in turn.

### A. Arbitration

Section 3 of the Federal Arbitration Act ("FAA") instructs that if a suit is brought "upon any issue referable to arbitration under an agreement in writing for such arbitration, the court … shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. This provision ensures arbitration agreements are enforceable like "other contracts, but not more so." *Prima Paint Corp.*

*v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967); *see also Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (explaining that the FAA "place[s] such agreements upon the same footing as other contracts" (quoting *Granite Rock Co. v. Int'l Bros. of Teamsters*, 561 U.S. 287, 302 (2010))); *Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 970 (7th Cir. 2007) ("[T]he FAA's purpose is not to provide special status for [arbitration] agreements."). Therefore, like any other contractual right, "the right to arbitrate is waivable." *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891 (7th Cir. 2020).

It is true, as the defendants posit, that "[f]ederal law favors arbitration," *Brickstructures, Inc.*, 952 F.3d at 891, but only so far as placing arbitration agreements "upon the same footing as other contracts," *Granite Rock Co.*, 561 U.S. at 302. Favoring arbitration does not mean that courts must jettison the traditional rules of litigation—even if the contract refers to an international arbitration tribunal. *See Brickstructures, Inc.*, 952 F.3d at 891. (VIPShop appears to incorrectly construe this argument as invoking international law and a choice-of-law issue, but the defendants' point speaks only to the relationship between arbitration and international forums.) Here, VIPShop replies that the defendants have waived their agreement to arbitrate based on their actions before this Court.

A waiver can be either express or implied. *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011). Both sides agree that the defendants did not explicitly waive their right to arbitrate. *See Brickstructures, Inc.*, 952 F.3d at 891 (noting that the issue of express abandonment is often easy, some phrase akin to "'I waive arbitration'

4

answers the question"). The inquiry, then, turns to whether they impliedly waived their right to arbitrate.

The policy underlying implied waiver "prevents parties from waiting to see how they fare in a judicial forum before choosing arbitration, prevents the duplicative adjudication of disputes, and prevents the undue prejudice that results from a party spending time and money on litigation that will not ultimately resolve a case." *Kawasaki Heavy Indus., Ltd.*, 660 F.3d at 994–95. A party impliedly waives arbitration when "based on all the circumstances, the party against whom the waiver is to be enforced has acted inconsistently with the right to arbitrate." *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002). Several factors inform the waiver analysis: most heavily, "diligence or the lack thereof," as well as participation in litigation, a substantial delay in requesting arbitration, the commencement and engagement in discovery, and prejudice to the other party. *Kawasaki Heavy Indus., Ltd.*, 660 F.3d at 994; *see also Cabinetree of Wisc., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995); *St. Mary's Medical Ctr. of Evansville, Inc. v. Disco Aluminum Products Co., Inc.*, 969 F.3d 585, 589–91 (7th Cir. 1992). Although the Supreme Court recently held federal courts could not fashion an arbitration-specific rule requiring prejudice as a condition of waiver, it did not cast doubt on the proposition that prejudice can be a factor in deciding whether a party impliedly waived arbitration. *Morgan*, 142 S. Ct. at 1712–13; *see also St. Mary's*, 969 F.2d at 590.

For two years, the Court has monitored this litigation during which the Defendants never moved for arbitration. Usual practice requires the party seeking to invoke arbitration to do so at the earliest stage of the proceeding. This makes sense, of course, because the party seeking to invoke the clause is essentially seeking to dismiss the action from federal court to remove it to the arbitrator where the case will be decided. Any discovery will take place before the arbitrator. Here,

however, at no point prior to its response to summary judgment did the defendants invoke their right to arbitrate. Instead, the defendants filed an answer to the complaint, (Dkt. 15), filed a joint status report and confidentiality order, (Dkt. 19, 30), participated in settlement conferences and status hearings, (Dkt. 33, 37, 43, 44, 45, 46, 51, 53), requested deadline extensions, (Dkt. 9, 23, 59, 62), and perhaps most importantly, engaged in discovery, including by providing formal responses to VIPShop's requests for admissions, (Dkt. 57).[1] *See, e.g.*, *Smith*, 907 F.3d at 500 (weighing the fact that two dispositive motions were already pending in favor of waiver); *St. Mary's*, 969 F.2d at 591 (noting that discovery represents a crucial step in waiving arbitration because the process can be onerous and certain discovery options would not necessarily be available in arbitration). These actions signal a decision to litigate, not arbitrate, a case.

The over two-year delay in requesting arbitration also favors finding waiver—and is significantly longer than the inexcusable delay recognized in other cases. *See Smith*, 907 F.3d at 500 (eight months); *Cabinetree*, 50 F.3d at 391 (eight months); *St. Mary's* 969 F.2d at 589 (ten months); *see also Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 950 (7th Cir. 2020) ("A delay of over three-and-a-half years is alone sufficient to find waiver, particularly where [one party] actively participated in the litigation."). Significantly, VIPShop would be harmed by submitting the case to arbitration. It has already incurred significant legal expenses seeking to recover its loss, and any further delay would postpone the ability to recoup nearly $2 million. *See St. Mary's*, 969 F.2d at 591 ("Disco's delay caused St. Mary's the expense of litigating in court, as well as … making St. Mary's endure two years of what would have been (had Disco succeeded) wasted litigation."). In short, the defendants acted "inconsistently with the right to arbitration" and impliedly waived the option altogether. *Welborn Clinic*, 301 F.3d at 637. Neither TTCL nor Pon

---

[1] The fact that VIPShops identified the arbitration provision and governing law in its complaint is immaterial; the Court focuses only on the actions of the defendants.

acted diligently in requesting arbitration and ordering arbitration at this juncture would prejudice VIPShop.

### B. Breach of Contract

There is little dispute regarding the breach of contract claim. To prevail on a breach-of-contract claim, a plaintiff must "prove that (1) a contract existed; (2) the plaintiff performed his obligations under the contract; (3) the defendant breached the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach." *Anderson v. Kohler*, 922 N.E.2d 8, 18 (Ill. App. Ct. 2009); *see also Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, 665 F.3d 897, 905 (7th Cir. 2011). TTCL undoubtedly breached the contracts—a conclusion the company does not dispute. VIP Shop and TTCL entered into two contracts. (Dkt. 57 ¶¶ 1–2). VIPShop performed its obligations by paying TTCL over $2.5 million. (*Id.* ¶¶5–9). TTCL did not supply the masks and clothing units, nor has TTCL refunded the amount owed to VIPShop. (*Id.* ¶9). As such, TTCL is liable for breaching both contracts. The only remaining question is whether Pon can be held *personally* liable for TTCL's debt to VIPShop.

### II. Piercing the Corporate Veil

Having lost nearly $2 million from the breach, VIPShop seeks to hold Pon personally liable along with the corporation by alleging essentially that she is one and the same. Normally, a corporation is presumed to be "separate and distinct from its officers, shareholders, and directors, and those parties will not be held personally liable for the corporation's debts and obligations." *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 941 (Ill. App. Ct. 2007). But in some circumstances, "courts will find them personally liable for a corporation's obligations through the equitable remedy known as piercing the corporate veil." *Steiner Elec. Co. v. Maniscalco*, 51 N.E.3d 45, 56 (Ill. App. Ct. 2016). The concept is that a party

should not be able to harm another party and then hide its assets from that party by claiming that the corporate entity cannot pay for that harm. *See Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743 (7th Cir. 2012) (noting that shareholders or officers cannot use a "web of corporations to avoid their responsibilities … by ensuring that [the corporation] would not have sufficient funds to pay their debts" and "adhering to [this] corporate form would sanction an attempt … to set up 'a flimsy organization to escape personal liability'" (quoting *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 611 (7th Cir. 2009))). Here, VIPShop has already been told that the entity cannot repay them for the loss and so they seek to hold the individual responsible. In piercing the corporate veil, the aggrieved party seeks to break down the façade that protects an individual from payment by hiding behind the corporate structure.

A plaintiff can pierce a corporation's veil of limited liability when there is (1) "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist" and (2) "adherence to the fiction of separate corporate existence would sanction [] fraud, promote injustice, or promote inequitable consequences." *Roiser v. Cascade Mountain, Inc.*, 855 N.E.2d 243, 250–51 (Ill. App. Ct. 2006); *see also Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751–52 (7th Cir. 2012). As to whether there is sufficient "unity of interest," Illinois courts look to several considerations:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among

related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill. App. Ct. 2005). "A party seeking to rely on the corporate veil theory need not prevail on all [] factors, and no single factor is dispositive, but a court should take all of the variables into consideration." *Roiser*, 855 N.E.2d at 567.

There is no doubt that TTCL and Pon operated with sufficient "unity of purpose" that the notion of the company's separate existence ceased to exist. The first factor, the capitalization of a corporation, is perhaps the most significant factor in determining whether a legitimate separate corporate entity existed, and one that suggests a unity of purpose here. *Fiumetto v. Garrett Enters., Inc.*, 749 N.E.2d 992, 1005 (Ill. App. Ct. 2001); *see also Jacobson v. Buffalo Rock Shooters Supply Inc.*, 664 N.E.2d 328, 332 (Ill. App. Ct. 1996) ("An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability." (quoting *Gallagher v. Reconco Builders, Inc.*, 415 N.E.2d 560, 564 (Ill. App. Ct. 1980))). TTCL has inadequate capitalization—also termed undercapitalization, that is, a company with insufficient capital to operate normally and repay creditors—as it admits that it can neither refund VIPShop nor pay its debts. (Dkt. 66 ¶ 21, 66-1 ¶ 9). Of course, TTCL had no difficulty in accepting payments from Plaintiffs of over $2.5 million but when it fails to deliver on the product, the entity claims it cannot repay. Additionally, TTCL never claimed to issue stock or pay dividends, (*see generally* Dkt. 64); Pon is the "only member" and "only manager" of TTCL, (Dkt. 65 ¶¶ 10–12); there are no other employees except her and close family members, (*id.* ¶ 12); and Pon maintains "exclusive control" over TTCL's bank account, which she registered to her home address, (*id.* ¶14). These facts indicate

9

that Pon never maintained an "arm's length relationship," and the corporate operated as a "mere façade." *Fontana*, 840 N.E.2d at 778.

The defendants submit that TTCL was not a "sham" corporation because TTCL was a properly formed company, had a separate bank account and contractors, and filed the appropriate articles of incorporation and annual reports with the Illinois Secretary of State. (Dkt. 64 at 6). *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, makes clear, however, that filing all the necessary paperwork does not, by itself, undermine a unity of purpose. *See id.* at 781. A court is permitted to consider and assign greater weight to other factors, as "no single factor is dispositive." *Roiser*, 855 N.E.2d at 567. The lone case cited by the defendants for this proposition, *Bank of Am. v. WS Mgmt., Inc.*, 33 N.E.3d 696 (Ill. App. Ct. 2015), engaged in a similar multifactor analysis without assigning undue reliance on the articles of incorporation, *see id.* at 927–32.

For the second prong, adherence to the separate-corporate-identity fiction would promote injustice. One recognized example of injustice occurs when denying veil piercing would allow a corporate officer "to be unjustly enriched at plaintiff's expense." *B. Kreisman & Co. v. First Arlington Nat. Bank of Arlington Heights*, 415 N.E.2d 1070, 1073 (Ill. App. Ct. 1980); *see also Wachovia Sec., LLC*, 674 F.3d at 756 ("Illinois law endorses veil piercing to avoid unfair enrichment, permitting the creator of a liability and cause of the inability to meet that liability to escape responsibility …."). VIPShop paid $2.5 million and is still owed almost $2 million. TTCL has conceded that it cannot reimburse any additional amount. Thus, there would be no effective remedy to address the unfairness. Given the "unity of purpose" between TTCL and Pon, as well

10

as the clear injustice, Pon cannot shield herself behind the corporate façade. She is personally liable for TTCL's obligations to VIPShop.

## CONCLUSION

For these reasons, Plaintiff's Motion for Summary Judgment is granted. (Dkt. 55). Plaintiff shall submit a proposed order with the exact amount of funds due on or before 9/19/22. Defendants may file objections to the amount, if any, on or before 9/26/22.

_____
Virginia M. Kendall
United States District Judge

Date: September 9, 2022